An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the *North Carolina Rules of Appellate Procedure*.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-316

Filed 15 October 2025

Alamance County, Nos. 21JA000140-000, 21JA000141-000

IN THE MATTER OF: N.E.S. & N.L.M.

Appeal by Respondent-Mother from order entered 18 October 2024 by Judge C. Douglas Green in Alamance County District Court. Heard in the Court of Appeals 24 September 2025.

*Attorney Rebekah W. Davis, for respondent-appellant mother.*

*Attorney Jamie L. Hamlett, for petitioner-appellee Alamance County Department of Social Services.*

*Attorney Matthew D. Wunsche, for respondent-appellee Guardian ad Litem.*

STADING, Judge.

Respondent-Mother ("Mother") appeals from an order of the trial court terminating her parental rights to N.E.S. ("Nora") and N.L.M. ("Neal").[1] Mother contends certain dispositional findings of fact are unsupported by competent evidence. Mother also asserts the trial court abused its discretion by concluding that

---

[1] We use pseudonyms to protect the identities of the minor children involved in the instant appeal. *See* N.C. R. App. P. 42(b) ("Appeals filed under N.C.G.S. § 7B-1001 . . . must use initials or a pseudonym instead of the minor's name.").

termination of her parental rights was in Nora's and Neal's best interests. After careful consideration, we affirm the trial court's order.

## I.  Background

Between 2015 and 2021, the Alamance County Department of Social Services ("DSS") received eight reports regarding Mother, highlighting "concerns of substance abuse, injurious environment, and improper supervision." On 7 December 2021, DSS received a new report, noting that the Burlington Police Department had found the minor children "home alone at approximately 4:02 AM" while Mother was out drinking. The minor children had last seen Mother the previous night and did not know where she went; however, they noted Mother had told them "not to answer the door." Additionally, the minor children were unable to "verbalize the last time they had a bath," stated they "last ate when it was light outside," and "were scared while they were home alone." After several unsuccessful efforts at finding an alternative care arrangement for the minor children, DSS obtained "[e]mergency non-secure custody . . . at 5:56 AM[.]"

That same day, DSS filed petitions alleging that Nora and Neal were neglected and dependent juveniles. The petitions mirrored each other, asserting that: Mother "does not provide proper care, supervision, or discipline"; Mother "creates or allows to be created a living environment injurious to the juvenile[s'] welfare"; and Mother "is unable to provide for the juvenile[s'] care or supervision and lacks an appropriate alternative childcare arrangement."

On 10 March 2022, the trial court adjudicated Nora and Neal as neglected juveniles. The trial court's findings reflect that in addition to the prior reports and the events on 7 December 2021, law enforcement responded to calls from Mother's address ten times between April 2021 and December 2021 for the following reasons: "someone refusing to leave/screaming/trespassing"; "[M]other and an individual g[etting] into a physical altercation," and "[Mother's] brother . . . having a party at the home [while] the kids were present"; "communicating threats/issues with the children's father"; a "drug related call" alleging there were people "in the home smoking crack with the children present"; a "medical call due to a 36 year old choking"; a report alleging "larceny of stolen cards"; and a report alleging that a "suspect in a shooting . . . was . . . at th[e] address."

The trial court determined "the juveniles would be at substantial risk of harm if left in the care of [Mother]," and "Mother ha[d] acted inconsistently with her constitutionally protected rights in that the juveniles were neglected while in her care." At that time, the trial court ordered reunification as the permanent plan, ordered guardianship as the secondary plan, and set the following case plan for Mother to effectuate reunification:

- [D]evelop a sufficient source of income to support herself and the children and use funds to meet basic needs. . . .

- [P]rovide a safe, stable and appropriate home environment. . . .

- [R]efrain from allowing her substance abuse and/or mental health to impact parenting and provide a safe, appropriate home by not exposing her children to injurious environment. . . .

- [D]emonstrate the ability to implement age-appropriate disciplinary practices and parenting skills. . . .

- [D]emonstrate the ability to assure the medical needs of the children are met . . . [and] assure appropriate supervision.

- Contact . . . the Child Support Agency at 336-570-6579 to establish a voluntary support agreement.

- Sign release of information forms for all service providers to allow the Department and GAL access to information regarding the case.

From October 2022 to August 2024, the trial court conducted ten permanency planning hearings to evaluate Mother's progress. Although Mother initially demonstrated success,[2] the orders entered as a result of those proceedings ultimately reflect that Mother failed to make sufficient progress toward effectuating reunification with the minor children. In the sixth permanency planning order, the trial court changed the primary plan to adoption and the secondary plan to reunification since Mother was not complying with the recommendations of her case

---

[2] For example, in the second permanency planning order, the trial court ordered DSS to place the minor children with Mother for a "trial home visit" in light of her progress. But during a home visit thereafter, DSS discovered "pill bottles . . . throughout the home," a "water hose connected in the kitchen," and an "excess of dirty dishes[.]" Additionally, Mother did not have the keys to her home, expressed "that she had used cocaine when the children were not home," and reported "seeing a guy" who "shot a gun in the air" while leaving the home one day. As a result, the children were "removed" from Mother's care again.

plan; in the ninth permanency planning order, the trial court changed the secondary plan from reunification to guardianship; and in the final permanency planning order, the trial court concluded that "[i]t is in the best interest to pursue termination of parental rights at this time as the primary plan is adoption and efforts towards reunification have been unsuccessful for more than two years."

On 18 June 2024, DSS filed a motion to terminate Mother's parental rights on the grounds of neglect, willful failure to make progress, willful failure to pay the cost of care, and dependency. *See* N.C. Gen. Stat. § 7B-1111(a)(1)–(3), (6) (2023). At the adjudicatory phase, the trial court concluded that clear, cogent, and convincing evidence supported grounds for termination on the basis of neglect, willful failure to make progress, and willful failure to pay the cost of care. The trial court found that although Mother had made some progress, she failed to adequately address several concerns, including her: substance abuse; mental health; exposure to domestic violence; ability to maintain stable employment; and ability to provide a safe home.

At the dispositional phase, the trial court entered findings of fact in accordance with N.C. Gen. Stat. § 7B-1110(a)(1)–(6) (2023) concerning the juveniles' age, their likelihood of adoption, whether termination of Mother's parental rights would help achieve the juveniles' permanent plan, the bond between Mother and the juveniles, the bond between the proposed adoptive placement and the juveniles, and other relevant considerations:

> After having found adjudicatory grounds, from the

evidence of the parties presented at the dispositional/best interest phase, including the report from the GAL Advocate [ ], the Court makes the following additional FINDINGS OF FACT:

113. The forgoing findings of fact are incorporated herein as if fully set out.

114. [Nora] is 8 years old.

115. [Neal] is 10 years old.

116. That there is a high likelihood that [Nora] and [Neal] will be adopted. They are young and in need of a permanent plan of care as soon as possible.

117. The foster parents were previously willing to adopt but because of the back and forth with the primary plan, do not want to get their hopes up. The foster parents have never asked for the children to be moved and the children have lived with them for well over a year. The foster parents indicate adoption is on the table but want to await the Court's decision.

118. The permanent plan of care is currently adoption. Termination of Parental Rights will free [Nora] and [Neal] to be adopted and give them a chance for permanent and safe home.

119. [Nora] and [Neal] have a strong bond with [Mother]. They love her and express a desire to reside with their mother but also express a desire to be with the foster parents. They look forward to seeing their mother. [Neal] is seen to be looking for his mother's car during times of visitation.

120. Despite this bond, when [the social worker] had to inform the juveniles that reunification was going to have to slow down (April of 2024), the juveniles seemed resolved to this scenario. The juveniles appear to be content where they are or content to return to their mother. This is

*Opinion of the Court*

markedly different than when the case began and is a reflection of the many ups and downs in this case.

121. Despite the significant bond with their mother, [Mother] is unable to demonstrate sobriety or sound judgment across time so that she can be a consistently safe and appropriate caretaker. This is having a negative impact on the children.

122. The juveniles are in foster care placement and have bonded well to the foster parents. [Nora] and [Neal] talk openly and freely with the foster parents. They make constant eye contact with smiles toward the foster mother and father.

123. The foster care placement allows [Nora] and [Neal] to have a stable and safe residence and is in the best interest of them both.

124. The courts have inquired to other family members that would be able to take the children with no success.

125. [Nora] would like to stay with the foster parents but also wants to be with [Mother]. When asked which she would prefer her reply was either.

126. [Neal] would like to stay with the foster parents but also wants to be with [Mother]. When asked which he would prefer his reply was either.

127. [Nora] and [Neal] each have enhanced needs. [Nora], at times, demonstrates extreme behaviors. [Neal] struggles academically. [He] requires extra intervention at school and home to manage these issues, including therapy. The foster parents demonstrate the ability to balance these needs, as well as engage the juveniles in extracurricular activities.

128. [Mother] acknowledges that the foster parents have been wonderful with the children, as well as been a source of strength and encouragement for her. She testified that

she could not have chosen better foster parents for her children.

129. The Court acknowledges that [Mother] loves her children very, very much and the children love her as well. The Court takes this into consideration when making this decision. The issue is that it has been well over two years since the children were removed and the mother still is not in a position to provide care for the minor children.

130. The minor children struggle with transitions and the repetitive efforts towards reunification with stalling out and having to start again has been hard for everyone involved, especially the children. They need stability and permanency. It is the Court's genuine hope that the foster parents will choose to allow [Mother] to remain involved with the children in some capacity.

131. The minor children have favorable prospects for adoption or other permanent placement and termination of parental rights is in the best interest of the children.

132. It is necessary in order to promote the health, physical, and emotional well-being for the juveniles that a permanent plan of care be made at this time.

In view of these dispositional findings, the trial court concluded that termination of Mother's parental rights was in Nora's and Neal's best interests. Mother timely entered notice of appeal from the trial court's termination order on 5 November 2024.

## II. Jurisdiction

This Court has jurisdiction over Mother's appeal under N.C. Gen. Stat. §§ 7A-27(b)(2) (2023) ("From any final judgment of a district court in a civil action"), and 7B-1001(a)(7) (2023) (Appeal of right from any "order that terminates parental rights

or denies a petition or motion to terminate parental rights").

### III. Analysis

Mother asks this Court to determine whether the trial court abused its discretion by concluding that termination of her parental rights was in Nora's and Neal's best interests. Mother maintains that several dispositional findings of fact are not supported by competent evidence; and the trial court's dispositional findings do not support its ultimate conclusion, thereby resulting in a manifestly unreasonable decision. We disagree.

"The termination of a parent's parental rights in a juvenile matter is a two-stage process consisting of an adjudicatory stage and a dispositional stage." *In re C.B.*, 375 N.C. 556, 559, 850 S.E.2d 324, 327 (2020). "At the adjudicatory phase, the trial court determines whether any of the statutory grounds for terminating a parent's parental rights delineated in N.C. [Gen. Stat.] § 7B-1111 exist, with the petitioner being required to prove the existence of any applicable ground for termination by clear, cogent, and convincing evidence." *In re I.E.M.*, 379 N.C. 221, 223, 864 S.E.2d 346, 348 (2021). If "the trial court determines that the petitioner has established the existence of at least one ground for termination, the case moves to the dispositional phase, at which the trial court must 'determine[ ] whether terminating the parent's rights is in the juvenile's best interest.'" *Id.* (quoting N.C. Gen. Stat. § 7B-1110(a)).

Mother's appeal thus solely touches and concerns the trial court's actions at

the dispositional stage, leaving the grounds for termination at the adjudicatory stage unchallenged.[3]  *See, e.g.*, *In re E.F.*, 375 N.C. 88, 91, 846 S.E.2d 630, 632 (2020) ("Respondent does not challenge the grounds for termination adjudicated by the trial court under N.C. [Gen. Stat.] § 7B-1111(a), but argues that the trial court abused its discretion in concluding it was in the children's best interests that respondent's parental rights be terminated.").

## A. Dispositional Findings of Fact

Mother challenges several dispositional findings made by the trial court.  She asserts that Findings of Fact Nos. 118, 119, 121, 125, 126, and 129 are not supported by competent evidence.  We disagree.

In determining whether termination of parental rights is in a juvenile's best interests at the dispositional phase, the trial court must consider the statutory criteria enumerated in N.C. Gen. Stat. § 7B-1110(a)(1)–(6), and it must make written findings in accordance therewith, if relevant.  "We review the trial court's dispositional findings of fact to determine whether they are supported by competent evidence."  *In re C.B.*, 375 N.C. at 560, 850 S.E.2d at 328 (citation omitted). "Competent evidence is evidence that a reasonable mind might accept as adequate to support the finding."  *In re J.M.*, 384 N.C. 584, 591, 887 S.E.2d 823, 828 (2023) (citation omitted).

---

[3] Mother's brief states "there is no argument about grounds to terminate parental rights."

"In making findings of fact, 'it is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn from the testimony.'" *In re R.D.*, 376 N.C. 244, 258, 852 S.E.2d 117, 129 (2020) (citation omitted). "The trial court's dispositional findings are binding on appeal if they are supported by any competent evidence. We are likewise bound by all uncontested dispositional findings." *In re E.F.*, 375 N.C. at 91, 846 S.E.2d at 632 (citations omitted). "Moreover, findings of fact are binding 'where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary.'" *In re R.D.*, 376 N.C. at 258, 852 S.E.2d at 129 (citation omitted).

### 1. *Finding of Fact No. 118*

In the instant case, Finding of Fact No. 118 provides:

> The permanent plan of care is currently adoption. Termination of Parental Rights will free [Nora] and [Neal] to be adopted and give them a chance for a permanent and safe home.

Mother maintains "the finding is not fair, as it does not address" the secondary plan of guardianship. *See, e.g., In re S.M.*, 380 N.C. 788, 796, 869 S.E.2d 716, 724–725 (2022) ("While respondent-father does not expressly challenge the evidentiary support for finding of fact 85, he contends the finding fails to take account of Sarah's concurrent permanent plan of guardianship which, unlike adoption, would not require the termination of his parental rights."). She also asserts that the finding

failed to consider alternative evidence showing that Nora and Neal looked forward to seeing her and loved her.

Our review leads us to conclude there is ample, competent record evidence demonstrating that termination of Mother's parental rights would help achieve the permanent plan of adoption—including prior permanency planning orders, the termination petition, the testimony of a DSS social worker at the termination hearing, the testimony of the children's guardian ad litem ("GAL") at the termination hearing, and the GAL's report. Moreover, like the respondent in *In re S.M.*, Mother "offers no authority for h[er] assertion that N.C. [Gen. Stat.] § 7B-1110(a)(3) requires the trial court's order to address the secondary plan." *Id.* at 797, 869 S.E.2d at 725. "More fundamentally, the paramount consideration must always be the best interests of the child." *In re J.J.B.*, 374 N.C. 787, 795, 845 S.E.2d 1, 6 (2020). Based on the competent evidence, "[u]nquestionably, the termination of [Mother's] parental rights was a necessary precondition of" the minor children's adoption. *In re S.M.*, 380 N.C. at 796, 869 S.E.2d at 725.

Although Mother identifies the presence of other evidence in the record, *Cf. id.* at 797, 869 S.E.2d at 725, "[t]he trial court's dispositional findings are binding on appeal if they are supported by any competent evidence." *In re E.F.*, 375 N.C. at 91, 846 S.E.2d at 632 (citations omitted). This is true even if other evidence "might sustain findings to the contrary." *In re R.D.*, 376 N.C. at 258, 852 S.E2d at 159 (citation omitted). And contrary to Mother's urging, the trial court considered the

strong bond between her and the minor children in several dispositional findings, including Findings of Fact Nos. 119–21, and 129.

Finally, it is not within this Court's authority to re-weigh evidence when determining whether findings of fact are supported by competent evidence on appellate review. *See, e.g., In re L.Z.A.*, 249 N.C. App. 628, 636, 792 S.E.2d 160, 167 (2016) (quotation marks omitted) ("The trial court's finding . . . is directly supported by [the] testimony, and it is not our duty to re-weigh the evidence."); *see also In re R.D.*, 376 N.C. at 258, 852 S.E.2d at 129 (citation omitted) ("'[I]t is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn from the testimony.'"); *see also Williamson v. Williamson*, 217 N.C. App. 388, 392, 719 S.E.2d 625, 628 (2011) (citation and quotation marks omitted) (alteration in original) ("Because '[t]he trial court is in the best position to weigh the evidence, determine the credibility of witnesses and the weight to be given their testimony,' we refuse to re-weigh the evidence on appeal."). Accordingly, Mother's argument is overruled.

### 2. *Finding of Fact No. 119*

Mother next challenges Finding of Fact No. 119, which provides:

> [Nora] and [Neal] have strong bond with [M]other. They love her and express a desire to reside with their mother but also express a desire to be with the foster parents. They look forward to seeing their mother. [Neal] is seen to be looking for his mother's car during times of visitation.

She asserts the finding is inaccurate because it failed to differentiate "between the

children's attachment and connection with Mother and the foster parents."

At the termination hearing, the DSS social worker testified extensively about the strong bond between the foster parents and the minor children:

> Q. Can you tell us about their relationship with their foster parents?
>
> A. They [are] . . . very bonded to their foster parents, as well as to the foster parents' extended family. I do monthly home visits with them and have seen them interact with the foster parents on numerous occasions. It's a very comfortable and natural relationship. It's not without its ups and downs as 8 and 9-year-olds have a number of needs and attentions that have to be met, so there are some typical squabble and back and forth. But ultimately they're very bonded and comfortable in the placement.
>
> . . . .
>
> Q. Do the children appear to love the foster parents?
>
> A. They do.
>
> Q. Do the foster parents appear to love the children?
>
> A. They do.

The social worker also testified as to the minor children's bond with Mother, their desire to be with Mother, and their concurrent desire to remain with their foster parents:

> Q. What do the children describe that they want?
>
> A. . . . So the kids very much want to be with Mom. That's pretty consistent across -- what I'm able to get out of them is kind of -- you can just kind of tell it as well. They -- but they also very much like their school and want to stay in their school. They like their friends. They have friends in

the neighborhood, so I think honestly if the kids could have
it their way, I think they would pick up mom and plant her
in the house with them.

In accordance with the social worker's testimony—and consistent with the trial court's finding—the children expressed interest in living with both Mother and the foster parents. The GAL's testimony and report similarly notes that the children had expressed a desire to live with both Mother and their current foster placement. *In re E.F.*, 375 N.C. at 91, 846 S.E.2d at 632.

Additionally, the social worker relayed that the minor children were "always excited" to see Mother and "talk" to her. She added, the children "undoubtably" loved Mother, noting that the minor children regularly asked when they would see Mother following the conclusion of supervised visits. Viewed together, we hold that a reasonable mind would accept this testimony as adequate to support the trial court's finding. *In re J.M.*, 384 N.C. at 591, 887 S.E.2d at 828. Accordingly, Mother's argument is overruled—Finding of Fact No. 119 is supported by competent record evidence. *In re E.F.*, 375 N.C. at 91, 846 S.E.2d at 632.

### 3. *Finding of Fact No. 121*

Mother next challenges Finding of Fact No. 121, which provides:

Despite the significant bond with their mother, [Mother] is
unable to demonstrate sobriety or sound judgment across
time so that she can be a consistently safe and appropriate
caretaker. This is having a negative impact on the children.

Mother specifically challenges the portion of the finding that states she "is unable to

demonstrate sobriety or sound judgment across time[.]" Mother maintains that at times, she made appropriate choices. She also asserts that her "handling of her addiction and the children's care was produced by sound judgment." However, Mother fails to guide us to any competent record evidence in support of these assertions. *See* N.C. R. App. P. 28(b)(6). In fact, Mother fails to delineate which choices were appropriate, or how her handling of the situation was the product of sound judgment. *See id.*

In any event, we hold there is ample, competent record evidence showing that Mother was unable to demonstrate sobriety or sound judgment across time. *In re E.F.*, 375 N.C. at 91, 846 S.E.2d at 632. The prior permanency planning orders and the termination petition reflect that over the course of DSS's reunification efforts, Mother struggled with cessation from cocaine use, tested positive for controlled substances numerous times, and regularly refused to take drug screens. In fact, the first permanency planning order acknowledged that Mother was "diagnosed with cocaine use disorder and trauma-related disorder."

The social worker similarly testified that Mother had tested positive for cocaine at times or simply refused to be tested. She added that Mother previously had been diagnosed "with cocaine use disorder," attended various different treatment programs without success, and that it was not safe for the minor children to reside with a parent who was actively using cocaine. She further noted that Mother had exhibited "substantial lapses in judgment" over time, demonstrated a pattern of

instability with respect to her mental health, and demonstrated a pattern of instability with respect to housing.

In addition, unchallenged Finding of Fact No. 106[4] notes that Mother had admitted to "using cocaine every few weeks" as of June 2023. *See In re C.M.*, 273 N.C. App. 427, 430, 848 S.E.2d 749, 752 (2020) ("[U]nchallenged findings are presumed supported by competent evidence, and binding on appeal."). And in unchallenged Findings of Fact Nos. 110–11, the trial court acknowledged Mother's attempts at sobriety, noting that despite her efforts, she was unable to consistently remain free of substances and exercise sound judgment:

> 110. The Court acknowledges, as the mother's attorney argued, that [Mother] has voluntarily attended treatment. The problem is that she has to continue doing the treatment and cannot consistently stay free of substances. The treatment does not appear to be working. It is hard to find that over the two plus years the children have been in care that [Mother] has adequately addressed and remediated the issues of concerns. There is no way to know how she is going to manage with the children in her care or if she can keep them safe because stress is a trigger for her to use. Parenting is stressful. If [Mother] cannot manage when having short periods of care for the children, how is she going to handle 24-7 care responsibilities. Raising children is stressful because it requires 24 hours a day of giving yourself, whether physically or mentally.

---

[4] Although this finding was entered at the adjudicatory phase of the termination proceeding, the trial court expressly re-incorporated all of its adjudicatory findings when rendering its dispositional findings thereafter: "After having found adjudicatory grounds, from the evidence of the parties presented at the dispositional/best interest phase, including the report from the GAL Advocate . . . , the Court makes the following additional FINDINGS OF FACT: 113. The forgoing findings of fact are incorporated herein as if fully set out."

111. [Mother] continues to engage in risky behaviors, resulting in the children remaining in care for more than 12 consecutive months and out-of-home placement. She has not demonstrated the ability to overcome these issues or exercise appropriate judgment.

Although Mother demonstrated progress toward her substance abuse at times, we hold there is competent evidence supporting Finding of Fact No. 121. *See In re R.D.*, 376 N.C. at 258, 852 S.E.2d at 129 (citation omitted). Mother's argument is therefore overruled.

### 4. *Findings of Fact Nos. 125 & 126*

Mother next challenges Findings of Fact Nos. 125–26, which provide:

125. [Nora] would like to stay with the foster parents but also wants to be with [Mother]. When asked which she would prefer her reply was either.

126. [Neal] would like to stay with the foster parents but also wants to be with [Mother]. When asked which he would prefer his reply was either.

She asserts these findings are not supported by the evidence, and that even if so, the social worker's testimony provided evidence supporting a different conclusion. *Contra In re R.D.*, 376 N.C. at 258, 852 S.E.2d at 129 (citation omitted) ("[F]indings of fact are binding 'where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary.'").

Contrary to Mother's assertion, the GAL's report *expressly states* that both children did not have a preference as to whether they lived with Mother or their current foster placement. And at the termination hearing, the GAL confirmed as

much, testifying as to the conversation he had with the minor children as follows:

> Q. You testified earlier that my client's children said that they're fine either way?
>
> A. Yes.
>
> Q. With adoption.
>
> A. Yes.
>
> Q. Can you go into specifics of that conversation?[ ]
>
> A. I just asked them how they liked staying there. They said they like it. I said do you like staying with your mother, yes, and which one would you rather stay with. And they end up being -- the answer at the time was either, they don't care.

The DSS social worker testified that although "the kids very much want to be with Mom . . . [t]hey . . . also very much like their school and want to stay in their school. They like their friends. They have friends in the neighborhood[.]" She added that "if the kids could have it their way, I think they would pick up mom and plant her in the house with them." Moreover, after the last attempt to move home proved unsuccessful, the social worker acknowledged that the children had seemed to accept the fact that reunification with Mother would likely not happen:

> Q. You testified during the statutory phase about the kids seem to have accepted like when the last attempt to move home didn't work. Can you tell us a little bit more about that?
>
> A. So . . . like we've talked about kind of by this point, they have some big reactions to things. They can get out of hand when things don't go either how they were expecting it to

go or what they had worked out in their head . . . .

> [W]e opened up in a therapeutic setting with their counselors and the children to kind of explain to them that we're not as close to them going home as we thought they were and that there's a little bit more work to be done, and . . . I was on the phone, so I couldn't see them, but I didn't hear -- there weren't any outbursts.  I checked in with the foster parents afterwards, and I checked in with them more regularly after that to see, you know, had behaviors spiked, are we having difficulties at school, difficulties at home that had subdued, and there really wasn't any shift. And they've . . . never brought it up again as far as visits to. [Neal] will bring up that he wants to go with Mo[ther] and wants to know why he can't, which is not a new thing. But there wasn't -- I was expecting, you know, some . . . irregularity, some  disruption, and there wasn't, which to be as emotional as they can be kind of struck me as odd.

The evidence thus demonstrates that: the children had desired to stay with both Mother and the foster parents; the children had not expressed a preference on the matter to their GAL; and the children had seemed to accept the fact, per the social worker's testimony, that reunification with Mother was likely not possible moving forward after several failed attempts.  Although the social worker testified as to the children's continued desire to stay with Mother, she also testified that the children were happy living in either environment, and that, if possible, "the children would pick [Mother] up and plant her in the house with them."  Moreover, the trial court's findings are binding on appeal if supported by *any* competent evidence; even where there is evidence which could potentially support a different finding.  *See, e.g., id.*

Again, it is not this Court's task—or within this Court's authority—to re-weigh

evidence elicited during a termination proceeding on appellate review. *See id.* Since Findings of Fact Nos. 125–26 are supported by competent record evidence, Mother's argument is meritless and overruled. *See id.*

### 5. *Finding of Fact No. 129*

Mother next challenges Finding of Fact No. 129, which provides:

> The Court acknowledges that [Mother] loves her children very, very much and the children love her as well. The Court takes this into consideration when making this decision. The issue is that it has been well over two years since the children were removed and the mother still is not in position to provide care for the minor children.

Mother specifically challenges the portion of the finding that states she "still is not in a position to provide care for the minor children." Mother asserts the evidence shows she finished the court-ordered Substance Abuse Intensive Outpatient Treatment ("SAIOP"), continued with group and individual therapy, and continued with medication management. She also contends that the evidence shows she was committed to her sobriety and was willing to follow through with DSS's case plan.

Our review of the record leads us to conclude that this finding is supported by competent evidence—evidence a reasonable mind would accept as adequate to support a conclusion. *In re J.M.*, 384 N.C. at 591, 887 S.E.2d at 828. Although Mother maintained her sobriety at times, the record reflects that she demonstrated a pattern of relapse. Indeed, unchallenged Finding of Fact No. 107 acknowledged that Mother completed SAIOP, but also noted that she "has not consistently remained clean." *See*

*In re C.M.*, 273 N.C. App. at 430, 848 S.E.2d at 752. At the termination hearing, the social worker corroborated this finding on cross-examination, stating that although Mother had been trying, she failed to make "consistent upward progress."

The social worker also testified extensively about her concerns with further attempts at reunification with Mother, noting that Mother had demonstrated a pattern of setbacks, including three failed attempts at reunification as a result of positive drug screens:

> Q. What, if any, concerns do you have right now in regards to reunification with the mother?
>
> A. The concerns right now of the Department . . . is mainly rooted in the pattern that has arose. We get to these big milestone moments and then there's a setback typically in the form of a positive drug screen. There's been three attempts to reunify the children and there have been pretty substantial lapses in judgment that have occurred that have created a situation where the Department is kind of forced to consider the reality that should the children have been there when these lapses occurred, it would have created potentially harm and instability for them.

The social worker also testified about Mother's failure to make sufficient progress addressing mental health and housing concerns:

> There have been extensive efforts since 2021 by the mother as well to reunify, but those have been unsuccessful. Upon reviewing the mental health records, there are a lot of holes and inconsistencies that, again, kind of lend to that instability and not really being able to confidently say patterns and behaviors have changed. Upon reviewing the . . . different applications for housing and energy and assistance that we've talked about during this case plan, it kind of highlights an inability to comfortably say that the

mother can consistently provide for the children because
we don't really know what the full financial picture looks
like.

The social worker also noted that the minor children had been in foster care "since December of 2021"—a total of "two years and nine months."

In light of these observations, the social worker testified to "an inability to comfortably say that [M]other can consistently provide for the children[.]"  And moreover, the prior permanency planning orders demonstrate a pattern of insubstantial progress over the course of time.  Accordingly, there is competent record evidence to support Finding of Fact No. 129.  *In re J.M.*, 384 N.C. at 591, 887 S.E.2d at 828.  Mother's argument is overruled.

### B. Bests Interests Determination

Mother asserts the trial court abused its discretion by concluding that termination of her parental rights was in Nora's and Neal's best interests.  She contends the trial court failed to consider: her self-improvement; the family's bond and the minor children's emotions; the minor children's desire for Mother to remain a part of their lives; Mother's progress in dealing with substance abuse and mental health; and Mother's ability to care for the minor children.  *See* N.C. Gen. Stat. § 7B-1110(a).  Mother also attempts to reassert that certain dispositional findings are not supported by competent evidence, and that the trial court abused its discretion by failing to consider the minor children's secondary plan pursuant to N.C. Gen. Stat. § 7B-1110(a)(3).  We disagree.

"The trial court's assessment of a juvenile's best interests at the dispositional stage is reviewed solely for abuse of discretion." *In re A.U.D.*, 373 N.C. at 6, 832 S.E.2d at 700. "An '[a]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.'" *In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d 451, 455 (2015) (citation omitted) (alteration in original); *In re Z.A.M.*, 374 N.C. 88, 100, 839 S.E.2d 792, 800 (2020) (citation omitted) ("Under this standard, we defer to the trial court's decision unless it is 'manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision.'").

In determining whether termination of parental rights is in a juvenile's best interests, the trial court must consider the following statutory criteria:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C. Gen. Stat. § 7B-1110(a)(1)–(6). "It is clear that a trial court must *consider* all of the factors in section 7B-1110(a). . . . The statute does not, however, explicitly require written findings as to each factor." *In re A.U.D.*, 373 N.C. at 10, 832 S.E.2d

at 702. "The trial court shall . . . make written findings regarding those that are relevant." *In re Z.A.M.*, 374 N.C. at 99, 839 S.E.2d at 799.

Here, Mother attempts to re-challenge the competency of the dispositional findings already addressed in Section A of this opinion. She also attempts to re-assert the trial court's failure to make a written finding concerning the juveniles' secondary plan under subsection 7B-1110(a)(3). But since we have already determined these contested findings are supported by competent evidence, and Mother does not challenge the remaining dispositional findings, we are bound by all of the trial court's findings on appellate review. *In re E.F.*, 375 N.C. at 91, 846 S.E.2d at 632 (citations omitted) ("The trial court's dispositional findings are binding on appeal if they are supported by any competent evidence. We are likewise bound by all uncontested dispositional findings."). Moreover, we decline further consideration as to whether the trial court was obligated to consider the minor children's secondary plan in its dispositional findings in light of our resolution of the matter in Section A of this opinion. *See, e.g., In re S.M.*, 380 N.C. at 797, 869 S.E.2d at 725; *see also In re J.J.B.*, 374 N.C. at 796, 845 S.E.2d at 7 (cleaned up) ("Because the trial court made sufficient dispositional findings and performed the proper analysis of the dispositional factors, we conclude the trial court did not abuse its discretion by concluding that termination, rather than guardianship, was in the minor children's best interests.").

With that in mind, we hold the trial court did not abuse its discretion in concluding that termination of Mother's parental rights was in Nora's and Neal's best

interests. At the dispositional stage, the trial court's order reflects that it considered and made written findings as to all relevant factors in accordance with N.C. Gen. Stat. § 7B-1110(a)(1)–(6). The trial court's findings highlight, among other things, that: (1) Nora is eight and Neal is ten; (2) there is a high likelihood Nora and Neal will be adopted by their current foster placement; (3) termination of Mother's parental rights would help achieve the minor children's permanent plan of adoption; (4) the minor children have bonded "very well" with their current foster placement; (5) the minor children have a strong bond with Mother; (6) Mother's failure to make progress over the course of two years has had an impact on the minor children; (7) the enhanced needs of the minor children require special attention, and the current foster placement has been attentive to these needs; and (8) previous unsuccessful attempts at reunification with Mother have been hard on the minor children as they struggle with transitions.

Furthermore, the trial court considered each contention Mother purports that it failed to in its order. The trial court's dispositional findings—and other adjudicatory findings re-incorporated by reference—demonstrate as such. To that end: Finding of Fact Nos. 119–21, and 129 discuss the strong bond shared between Mother and the minor children; Finding of Fact No. 130 discusses how Mother's behavior negatively impacted the minor children; Finding of Fact No. 120 discusses the minor children's acceptance of the fact "that reunification was going to have to slow down (April of 2024)," noting "the juveniles seemed resolved to this scenario";

Findings of Fact Nos. 125–26 discuss the children's desire to remain with Mother, as well as their concurrent desire to stay in their current foster placement; Findings of Fact Nos. 107, 112, and 129 discuss Mother's progress in dealing with substance abuse and mental health, acknowledging her success at times; and, Findings of Fact Nos. 107, 112, and 129 discuss Mother's ability to care for the minor children in view of the totality of the evidence presented.

Based on these findings, the trial court concluded that termination of Mother's parental rights was in Nora's and Neal's best interests. The trial court thus properly adhered to subsection 7B-1110(a) when making its best interests determination, rendered findings supported by competent evidence, and appropriately weighed these findings within its discretion. *See, e.g., In re Z.A.M.*, 374 N.C. at 101, 839 S.E.2d at 800–01 ("Because the trial court made sufficient dispositional findings and performed the proper analysis of the dispositional factors, we are satisfied the trial court's best interests determination was not manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision.").

For example, in *In re A.U.D.*, the North Carolina Supreme Court was tasked with determining whether the trial court abused its discretion by denying DSS's petition to terminate the respondent's parental rights. 373 N.C. at 4, 832 S.E.2d at 699. The Court affirmed the trial court's decision, reasoning that the trial court adequately considered and weighed the factors enumerated in subsection 7B-1110(a)(1)–(5) as well as several other relevant considerations brought out by the

evidence under subsection 7B-1110(a)(6):

> Here, the trial court carefully weighed the competing goals
> of (1) preserving the ties between the children and their
> biological relatives; and (2) achieving permanence for the
> children as offered by their prospective adoptive family. In
> addition to the statutory factors set out in N.C. [Gen. Stat.]
> § 7B-1110(a)(1)–(5), the trial court also considered other
> relevant circumstances—as it was permitted to do under
> N.C. [Gen. Stat.] § 7B-1110(a)(6)—such as the fact that (1)
> [the juveniles] were relinquished to BCS solely at the
> behest of their mother; (2) respondent was never afforded
> the opportunity to parent [the juveniles] or provide for
> their care prior to their relinquishment; (3) upon learning
> of [the juveniles'] birth, respondent "proactively"
> attempted to establish paternity; (4) respondent desired
> that [their aunt] gain legal custody of the juveniles and
> [their aunt] was willing and able to provide a placement for
> [the juveniles] until respondent was released from
> incarceration; and (5) [their aunt] had previously cared for
> the juveniles and "did a good job" in doing so. The trial
> court further noted the strides in self-improvement that
> respondent had made during his incarceration.

*Id.* at 12, 832 S.E.2d at 703–04. The Court ultimately concluded that although

"evidence existed that would have supported a contrary decision[,]" it "lack[ed] the

authority to reweigh the evidence that was before the trial court." *Id.* at 12, 832

S.E.2d at 704. Consequently, the Court was "satisfied that the trial court's conclusion

. . . was neither arbitrary nor manifestly unsupported by reason." *Id.* Although *In re*

*A.U.D.* dealt with the denial of a petition to terminate parental rights as opposed to

a grant in the instant case, the Court's analysis of the trial court's best interests

determination is instructive. *Cf. id.* at 4, 832 S.E.2d at 699.

Similarly, in *In re Z.A.M.*, the North Carolina Supreme Court was tasked with

determining whether the trial court abused its discretion in terminating the respondent's parental rights. 374 N.C. at 101, 839 S.E.2d at 800. On review, the Court held that the trial court did not abuse its discretion because "it considered the dispositional factors in N.C. [Gen. Stat.] § 7B-1110(a) and performed a reasoned analysis weighing those factors." *Id.* at 101, 839 S.E.2d at 800–01. The Court noted:

> [T]he trial court recognized the children's bond with respondents, but weighed that bond against its findings that adoption was previously ordered as the primary permanent plan; that termination was necessary to achieve the primary permanent plan; that the children have been placed in their potential adoptive home with their maternal grandparents since April 2017; that the potential adoptive home is a loving and stable home where the children's needs are being met; that the children have a very good relationship with the maternal grandparents and are well bonded; and that it is very likely the children will be adopted.

*Id.* at 101, 839 S.E.2d at 801. The Court thus held, "[b]ecause the trial court made sufficient dispositional findings and performed the proper analysis of the dispositional factors, we are satisfied the trial court's best interests determination was not manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision." *Id.*

As in *In re A.U.D.* and *In re Z.A.M.*, the trial court's dispositional findings comport with N.C. Gen. Stat. § 7B-1110(a)(1)–(6), its findings are supported by competent evidence, and it weighed these findings appropriately when making its discretionary best interests determination. With respect to Mother's bond with the

minor children, the minor children's concurrent desire to return home, and the minor children's possibility for an emotional setback if reunification could not be achieved, the trial court noted the weight assigned. *See In re Z.A.M.*, at 101, 839 S.E.2d at 801 ("[T]he trial court recognized the children's bond with respondents, but weighed that bond against" the other factors in subsection 7B-1110(a).). Notwithstanding, it concluded that these matters were outweighed by its other dispositional findings, thus warranting termination of parental rights:

> 120. Despite this bond, when [the social worker] had to inform the juveniles that reunification was going to have to slow down (April of 2024), the juveniles seemed resolved to this scenario. The juveniles appear to be content where they are or content to return to their mother. This is markedly different than when the case began and is a reflection of the many ups and downs in this case.
>
> 121. Despite the significant bond with their mother, [Mother] is unable to demonstrate sobriety or sound judgment across time so that she can be a consistently safe and appropriate caretaker. This is having a negative impact on the children.
>
> . . . .
>
> 125. [Nora] would like to stay with the foster parents but also wants to be with [Mother]. When asked which she would prefer her reply was either.
>
> 126. [Neal] would like to stay with the foster parents but also wants to be with [Mother]. When asked which he would prefer his reply was either.
>
> . . . .
>
> 129. The Court acknowledges that [Mother] loves her

children very, very much and the children love her as well. The Court takes this into consideration when making this decision. The issue is that it has been well over two years since the children were removed and the mother still is not in a position to provide care for the minor children.

. . . .

131. The minor children have favorable prospects for adoption or other permanent placement and termination of parental rights is in the best interest of the children.

132. It is necessary in order to promote the health, physical, and emotional well-being for the juveniles that a permanent plan of care be made at this time.

Mother emphasizes the trial court's failure to consider or give proper weight to the bond between the family; but "the bond between parent and child is just one of the factors to be considered under N.C. [Gen. Stat.] § 7B-1110(a), and the trial court is permitted to give greater weight to other factors." *In re E.S*, 378 N.C. 8, 14, 859 S.E.2d 185, 190 (2021) (citation omitted). Moreover, contrary to Mother's request, this Court lacks the authority to re-weigh evidence.[5] *See, e.g., In re A.U.D.*, 373 N.C. at 11, 832 S.E.2d at 703. ("BCS contends . . . that the trial court should have relied at least in part on the report and testimony of the guardian ad litem in reaching its decision. The trial court's order clearly states that it had considered the report and

---

[5] Mother's brief states: "[T]he trial court dismissed the Mother's self-improvement and gave no real weight to the family's bond and the children's emotions. The trial court did not really consider the children's desire for Mother to remain a part of their lives. The trial court did not properly consider how far the Mother had progressed in dealing with substance abuse and mental health and her ability to care for Nora and Neal."

testimony of the guardian ad litem. The court, however, was not bound by that recommendation. Therefore, because the trial court possesses the authority to weigh all of the evidence, the mere fact that it elected not to follow the recommendation of the guardian ad litem does not constitute error.").

For all these reasons, we hold the trial court did not abuse its discretion in concluding that termination of Mother's parental rights was in Nora's and Neal's best interests. *In re T.L.H.*, 368 N.C. at 107, 772 S.E.2d at 455. Mother's final assignment of error is overruled.

## IV. Conclusion

Based on the foregoing, we hold that the trial court's dispositional findings of fact are supported by competent evidence. We further hold that the trial court did not abuse its discretion by terminating Mother's parental rights.

AFFIRMED.

Judge CARPENTER concurs.

Judge TYSON concurs in result only.

Report per Rule 30(e).